Our last case today and for the week is number 23-10925 United States v. Ivonne Lezcano. Before you start, I know you were court appointed and we want to thank you not only on behalf of ourselves but your client for accepting the case and doing the good work on her behalf, so thank you. Thank you, Your Honor. It's my pleasure doing so. May it please the court, my name is Manny Cassebill and I'm here representing Ivonne Lezcano. I'm here asking the court to set aside Ms. Lezcano's sentence and remand the case for re-sentencing. The reason why we are asking for re-sentencing is because we feel that the district court erred when it took into account intended loss into consideration when sentencing Ms. Lezcano. Generally, Ms. Lezcano pled guilty to committing fraud by buying merchandise using other people's credit cards and their personal identification information. As part of her plea, she admitted to possessing 57 unauthorized access devices, the unauthorized social security card in another woman's name, and she also admitted to having conducted at least $23,450 in fraudulent purchases. You say that would have led to, I forget the numbers from your brief, what, 10 to 16 months? That's correct, Your Honor. As an advisory guideline range if intended loss had not been used? Correct. In addition to the 10 to 16 months, it would have been the mandatories. Right, the aggravated identity theft on top of that. Yes, sir. Yes, sir. So is the only question here whether the new guideline should apply in this case? Is that basically, from your perspective, I mean is that the first thing we need to address? Yes, Your Honor. Actually, I was going to get to that towards the end of my argument because I was trying to do it in chronological order, but I believe it was longer. It seems like, maybe I'm wrong about this, it just seems like the first thing we have to address is whether the new guideline applies, and if we conclude that it doesn't, then we have to get to, okay, we got to do the analysis of whether loss means intended loss and look at ambiguity and all that kind of stuff to evaluate that. That is correct, Your Honor. In, I think it was August of last year, August 1st of last year, this court asked us to file a supplemental brief on the issue of whether or not the amendment which became effective November 1st of last year was to be applied retroactively, and the answer to that question is whether or not the amendment is clarifying or substantive. To conduct that analysis, Your Honor, we have to look to this court's decision in, I can't pronounce it, but it's, whatever, it's like Worcestershire sauce, but in that case, this court set out four factors that we are to consider in determining whether or not a case, I'm sorry, an amendment is substantive or clarifying. The factors set out in, you're sure, I'm not gonna try anymore, are whether or not the amendment alters the text of the guidelines, whether the commission described the amendment as clarifying or substantive, whether the commission included the amendment in the list of retroactive amendments in section 1B.1.10 of the guidelines, and whether the amendment overturned circuit precedent. I would suggest that the second and third factors do not come into play here because the commission did not describe the amendment in any way, and the commission did not include the amendment in section 1B.1.1, I'm sorry, point 10. The first factor is applicable here, and that factor is whether or not the amendment alters the text of the guidelines, and it does. I mean, the text of the guidelines is dramatically changed by including intended loss and now the text of the actual guideline as opposed to the commentary. The You're right about that, obviously, I mean, the text has changed, but what about the fact that the text has always been there in the commentary? It seems, it just seems more clarifying that the that the commission is saying, look, this has been here all the time in the commentary, and now we like really mean it, so we put it in the text. Well, by putting it in the text of the guidelines, you're changing the analysis of the definition. I mean, when it's in the commentary, you have to go through the analysis that we briefly discussed when we began here, which is whether or not the definition in the text is ambiguous or not, etc. And I guess that's where, and so I don't mean to belabor this point, but it just seems the question, if it weren't in the text, would be whether loss, the word loss itself, is ambiguous. Putting it in the text, the commission has eliminated that ambiguity, and just as a pure sort of like gut feeling, that seems clarifying because it eliminates the argument that there would be any ambiguity. Well, I believe it's a little bit more than just clarifying, because what we're doing is we're eliminating a step in the analysis as to what the definition of loss is. By putting it in the text, you no longer go through that analysis. In fact, by putting it in the text... It's a funny scenario because it's the answer to the question of whether it's clarifying or substantive depends on our case law, I think. If you were making this argument, if the question of clarifying or substantive were presented before Dupree, the government would have a pretty strong argument that it's clarifying because intended loss is in the commentary, and we've applied intended loss, and this is just sort of continuing. The commission decided to stick it in the text as opposed to the commentary, but now that we've said in Dupree that the commentary can't contradict the language of the guideline, then it looks more substantive than clarifying. That's correct, your honor. One of the elements that the Worcestershire sauce case talks about, the fourth one, is whether the amendment overturns circuit precedent. I would suggest that it does. Yeah, well, so I have difficulty with that because before the amendment, the question presented here was a question of, I mean, I think, was whether we should recognize the circuit precedent has been overturned because we have, for like 30 years, applied intended loss in these cases. So, at no point has our circuit said that actual loss is the answer here, right? Correct, your honor. We said in Dupree that there can be ambiguity and whatnot, but we haven't applied that logic to this question. Correct, and if I may be so bold, I would respectfully suggest that this circuit had it wrong. The cases, in fact, the cases that are cited by the government, Moran, Matry, I think it's Medina as well, all of those cases were decided prior to the Supreme Court case in Kaiser, and if you read those cases closely, none of them go through the analysis that the Supreme Court did in Kaiser. So, I would respectfully suggest that those, although, yes, for many years, we followed that precedent. I guess their reasoning may not have been consistent with the Supreme Court's latest explanation of administrative law principles, but if we were to say, I guess this is my concern that I'd like you to address, if we were to say that this was a substantive amendment because it changed circuit precedent, how could we say that when given our on-point circuit precedent applying intended loss? I'm not sure I understand, your honor. So, we've got 30 years of precedent where we've said intended loss works. Yes. We've never said actual loss is the standard, right? Correct. So, if we were to say that this is a substantive change, that seems inconsistent with the fact that we've had 30 years of precedent applying intended loss. It seems like we would have to say it's not a substantive change because all these people have been sentenced over 30 years with intended loss as the measure. Right. But this circuit has never really addressed that issue, your honor. And that was recognized in the Del Pino case where that question came up and this circuit specifically said, this court specifically said, we have never addressed this issue. So, Your position is that all of those decades worth of cases just simply applied it because, intended loss is in the commentary, but never really considered whether or not intended loss was authorized by the guideline. Right. I mean, it was pretty much just routinely applied. I don't think anybody really questioned it. And that's what we are doing here today. If I could just one final. So, in the Gertschower case, maybe, Gertschower case, we said this question about consistency with precedent is about whether the amendment overturns our circuit's precedent. And I guess that's where my concern comes from, is it looks like our circuit's precedent has consistently said intended loss. Now, we've never addressed sort of the full-on argument from administrative law principles about whether the commentary controls and all that kind of stuff. But we've definitely applied intended loss over the years. Right. I'm not sure that I disagree with this court, but at the same time, I can see a reading of the Worcester-Sauce case, I presume a reading of that case where it's overturning of the circuit precedent is not limited to overturning the 11th circuit precedent. I think it's broad enough where we could argue that overturning the precedent in the third, the sixth, and the ninth circuits is covered under that particular factor. Thank you. All right. Thank you very much. We'll give you your full time for rebuttal. Thank you, Your Honor. Mr. Brenner, welcome back. Good morning, Your Honors. It's great to be back with you and before Judge Covington for the first time. May it please the court, I'd like to start where we left off about whether this amendment is clarifying or substantive. And I completely agree with the point that Judge Brasher brought up about whether the amendment is consistent with this circuit's precedent. I think this court was clear in Gerstauer that it's about whether it overturns this circuit's precedent, and other circuits have weighed in when applying these factors and been very clear in the 10th circuit case we cited in our brief, been very clear that it's about whether it overturns this circuit's precedent. And that's because what that factor about circuit precedent is taking into account is exactly Judge Jordan's point about whether this is trying to get at exactly whether this is a substantive change. Would it require the court to overturn any of its precedent? If it would not require the court to overturn any of its precedent, then it is consistent and that lends to clarity. What do you, in terms of figuring out clarifying or substantive and that factor of changing circuit precedent, what do you consider precedent to mean? Like we have, you're right that we have tons and tons of cases over the decades applying and affirming sentences using intended loss. I don't know that we have any cases addressing whether intended loss is authorized under the guidelines before Kizor and or Kizor and Dupree have sort of teed up this issue. What do you consider precedent to be sort of in general terms? Is it cases where the issue has sort of been assumed not to exist or hasn't been raised or has been expressly addressed? I think in this case, we're able to go right to Moss, which was a post-Kizor case. I recognize that it was pre-Dupree, but I think what Moss is holding was, it's very important. Moss is holding was that when looking at intended loss, which was challenged in that case, what Moss said, this court in Moss said, was that the commentary was binding because it did not contradict the plain meaning, the plain text of the word loss. If the scope was not broad enough to cover intended loss, then the commentary would contradict the plain text. And so I think that holding is very important and that holding is what is consistent with the amendment. This court would not have to overturn Moss if it were to say that the amendment here applies because it's consistent with that holding. And so I think this court doesn't have to delve very far into what exact precedent because Moss is right there with a clear holding for it to point to and say it's completely consistent with the amendment. And I'd just like to go to another point. My friend on the other side said that the commission's description factor didn't really play in here because the commission didn't say one way or the other. I'd like to just point out, this court in Gershauer did say, the commission doesn't have to come right out and use the word clarifying. It didn't in Gershauer and this court said that it was clarifying because the commission's description did say that that was in effect what it was doing. And here the same is true. What the commission said was that... But the thing is, here's the conceptual problem, at least for me, and I don't know what the answer ultimately is, but a clarifying amendment usually is meant to address some uncertainty or ambiguity in language that already exists. And here it's the placing of intended loss from the commentary into the guideline itself. And that's not usually what you do with a clarifying amendment. You usually add something new that wasn't there before to explain the words that the commission initially used that people were having trouble understanding or figuring out. And this is sort of the movement of something from a commentary to the guideline, presumably because the commission thought there were going to be attacks, as there have been, on intended loss if that step wasn't taken. So it's just different. So I think that, for example, in this court's press and do case, that's exactly what the did. It moved language from the commentary to the text. And this court said that that was a clarifying amendment because it was simply delineating more clearly what the commission was trying to say. In Gershauer, I think the commission did something similar to what it did here. Not only... It didn't move something from the commentary to the text, but it added by supplement. Well, by adding a note to the text, that is a supplement. And what this court said in Gershauer was, when you add something by supplement, that is clarification of what you meant. So respectfully, I think what happened here is not an altering of the text, not an altering of the commentary. It is potentially a move from commentary to text, like what this court had in press and do, or it is simply a supplement. And it's clarifying because it is just delineating more clearly, as this court said in press and do, what the text already meant. And we can get to that as well. Let me ask you a question about that because you make a point in your supplemental brief about the location of the words in the guideline. So what's interesting to me about this change is that, I think I'm right about this, that the commission added a note that just said something to the effect of loss means actual are intended and didn't actually change the text of the guideline itself. Am I right about that? Right. So it didn't change the text of the guideline. It simply moved the definitions that already existed in the commentary to the text by way of a note. It puts an asterisk and it says notes to table, and then it lists the definitions there to delineate more clearly our position is what it meant by loss. But the intended loss being included in the guideline, just to Judge Jordan's point, was always the case. It didn't happen just because they moved the commentary to the guideline text. That just simply explains more clearly what they mean when they're asking the court to evaluate intended loss. I mean, it just seems to me the fact that it's like in a definition section suggests, and maybe not in every case, but it suggests clarifying because it's saying we already use these words, sorry, we already use these words and now we're clarifying what they mean by adding a definition section. It's certainly clarifying more clearly what they mean by moving that definition section into the text. And I think it's also important just to go back to the description because the commission was very clear about what it was doing here. The commission said that it was ensuring consistent loss calculations by bringing the third circuit back in line with how loss was being calculated in other circuits. And it even said, if we're going to leave for another day, whether we're going to change substantively, I would submit they didn't use the word substantively, but if we're going to change how loss is calculated. And we'll do that, they said, after a comprehensive review. They did not, so they were making clear what they're doing here is simply clarifying, simply maintaining the status quo and correcting the third circuit's, what we would say, misapplication of Kaiser. That's all the commission. Can we talk about the secondary issue? Sure. Which is not secondary, but second issue in line, which is related, but not exactly the same, which is if you think that intended loss has been put in as a clarifying amendment, and you can use intended loss, there's still an argument that a preset numerical amount for loss is still not consistent with even the new text of the guideline. Can you address that? Of course. So I agree. That's a, that's a slightly different argument. It's not an argument that you can't use intended loss at all, but that you can't use a prefigured amount when there is no loss and, and use that as the baseline. Yes. So I agree with your honor that it is a slightly different inquiry as to even assuming that loss does include intended loss. Can we then use the rule that's in the commentary, which is a floor of $500 per access device? And I would submit to your honor that the answer is yes. And the answer is yes, because the way we get there is by already acknowledging that loss does include intended loss. Then the question is, is there ambiguity when we are applying or trying to estimate, make a reasonable estimate of intended loss in the context of possession of access devices? And I think the answer is yes, that we can use this $500 floor because it is, if we go through the Kaiser analysis, it is the commission's official position. It's considered reasoned judgment based on a study and an analysis of what are the other consequential damages that are involved when someone possesses an access device. Congress itself commissioned this report. And in 2000, when the study was done, in 2000, they found that with stolen credit cards, the average loss for stolen credit cards was 3,300 and something dollars. And so the commission then said, okay, we have this average for stolen credit cards of $3,300. Our rule applies to access devices, which is broader than just credit cards. And so we think based on everything that we've looked at in this study, the right floor would be somewhere between $100 and $1,000. And when the commission sent that report to the sentencing commission, the sentencing commission very reasonably said, what we're going to do is we're going to go in the middle and we're going to say that the floor is going to be $500 per access device. That was the first time I'll point out that the commission raised in 2000, that the commission raised that floor since the first guidelines going all the way back to 1987, when what was included was a floor of $100. And the reason that floor was included, I think is important to note in the very first guidelines, the commission right from the beginning, the policy has always been, we do not distinguish a defendant's culpability between someone who completes their offense and someone who is foiled or someone who only attempts. The 2B1.1 and 2F1.1, which was the original fraud guideline, 2B1.1 originally only dealt with theft. All the way back to 1987, both of them point to 2X1.1, which is the attempt guideline. And they say, when they're talking about intended loss in 2F1.1, they say this is in keeping with the commission's policy on attempts. Because we do not distinguish between a defendant who is foiled in their completion of their crime or who just isn't able to complete the crime and only attempts, and the defendant who does complete their crime. But that just reinforces the commission's view that intended loss is an appropriate proxy in sentencing, but it doesn't necessarily get to the question of whether or not you can preset a floor for an offense. And not an inchoate offense, but an actual offense. So actually possessed the unlawful access device, you had created fake credit cards on a machine, but you were caught before you used them. Yes. And so what I was getting at is exactly in 1987, when they put in this $100 floor, they pointed to the reason we're doing that, they said C2X1.1 attempt. And what I read from that is what they were saying is, you are going to have an intended loss from someone who does possess an access device. They may complete that crime by simply possessing, but they've been stopped before they were able to use it. And we have to put a measure on that. And how do we measure that when there's all these other consequential damages? Because remember, the district court's job is to simply make a reasonable estimate based on the available information it has. And in a case like that, in the context of access devices, it's not so easy to make that estimate. Can I ask you a question about that? Of course. So here, the way I understand the district court's ruling on the $500 is one, the district court said, I looked at the commentary of $500, but it looks like the district court actually said a separate thing. The district court actually found that $500 was a reasonable estimate in the light of the evidence in this case. I mean, this is what the court said. It said, quote, where there was actual use in this case of an access device, it far exceeded $500. So I don't find that amount to be unreasonable and I guess my question is, isn't that, that finding at least seems kind of unrelated to this commentary issue. It seems like the district court is saying, even regardless of the commentary, I would still say $500. Your honor is exactly right. The court says this, page 21, docket entry 66, the judge says, but also the $500 is reasonable in light of the evidence in this case, because the actual use far exceeded $500. And that was absolutely the case. There were, for at least two of the victims, we know that victim SB, what the defendant used was the date of birth and social security number and charged $2,855. So much more than $500 per access device. And for victim SP, what the defendant used was the social security number and charged almost $6,000, $500, $995, way more than $500 for that access device. And so your honor is exactly right. We point this out in the brief that the judge in this case had two independent bases for his reasonable estimate of the loss, the intended loss for those access devices. The second being based on the evidence here. And we pointed out in our brief that the defendant or the appellant did not challenge that finding in the initial brief. And we submit to you that the defendant has abandoned that claim by not under subpoena, by not challenging all independent bases for the finding. And I would just point out that the appellant did not dispute that on reply. I think this is not a case. I mean, sometimes you see these cases where they catch somebody with a bunch of like credit cards or something and the government, there's just like no evidence about what they were doing with that or whatever, but this isn't that kind of case. Not that kind of case at all. And I would just point out, I mean, there does need to be evidence that there was an intended loss. And so you usually prove that you're usually able to do that because as the attempt guideline puts it, you're stopped on the verge of completion or you've substantially completed the crime. So there does have to be evidence before you can just assess an intended loss. And Your Honor is exactly right. We had ample evidence in this case and the court should affirm that finding on that basis. If the court has no further questions, I'd ask the court to affirm the sentence in this case. All right. Thank you very much, Mr. Brunner. This court raised an interesting question, which is where did the $500 number come from? That was addressed by the court in Riccardi, which is cited in the briefs. Riccardi, the court of Riccardi, did the research for us and found that the $500 number comes from a report that was directed by Congress to be performed. And the report was designed to determine the average loss per stolen cloned wireless telephones. That's where the $500 number comes from. The loss associated with a stolen wireless cloned telephone has nothing to do with a loss attributed to possession of a device that could be turned into a credit card. Didn't the judge make a specific finding here that the $500 was reasonable? Doesn't that somewhat negate your argument? Your Honor, the judge, when he made that statement, basically did not back that up with any type of analysis. One, two, there were no facts that were either admitted to the plea colloquy or in the factual proffer that would address that particular issue. Now, did we waive it? My position is that we did not waive it simply because there was no basis for that statement. Honestly, I don't know if it's a waiver issue so much as just that the district court identified another grounds for this. And so, even if it's sort of a harmless error issue, if you're right about the $500 not being a floor that can be applied, that the district court identified another grounds for it that really no one has challenged. I mean, I've looked at the pre-sentence report. I mean, the pre-sentence report has all sorts of dollar figures in it from victim losses. I assume you didn't challenge those paragraphs in the pre-sentence report. Right. Your Honor, if I may, before I forget, the court also said that the $500 figure was something based upon an analysis done by the commission. And I submit that the court was wrong there, as Ricardi points out. I think when I first started many, many years ago, when I had my first fraud case, I'm saying, where did $500 come from? And, of course, I relied on the decades of precedent and figured, well, I can't challenge that. But that $500 figure has no basis in any type of report, no basis in any kind of data that the commission can point to to say it's a valid number. It's simply a number picked out of thin air, if you will. Let me ask you a question on the other issue, the retroactivity, substantive versus clarifying. It seems like our case law on that is really trying to get at this issue, sort of a due process issue, which is, if the commission comes out with an amendment, we shouldn't be applying that amendment in sort of a haphazard way. We should make sure that everything is being consistently. And I think, maybe I'm wrong about this, but I think if we say that this amendment is not clarifying, then we would not use intended loss for your client, but for all clients, really up until this case, and for all defendants going forward in the future, we would use intended loss. So there would only be a small subset of people who committed their crimes, I don't know when, over the last two years or something, that would get an actual loss calculation, and everybody else would get an intended loss calculation. And that just seems inconsistent with sort of fairness and due process. Do you have any thoughts on that? I did give that some thought, Your Honor. And my position is, had this amendment been effective prior to Ms. Liscano's sentencing, we wouldn't be here. We wouldn't have this issue. The law changes occasionally. Sometimes precedents are set aside. What will happen, and what I submit should happen, is that we're dealing here with Ms. Liscano's sentence. And that, and only that. I know the court is probably looking at this in a broader sense, and what effect would this have on all the other cases that are not presently here right now before the court. But moving forward, it would be fair to apply intended loss, because we're all put on notice that now it's no longer in the commentary. It's part of the text. Therefore, deference should be given to the Commission's interpretation. But that's forward. And it would be fair to apply it moving forward. Backwards, I don't know how to address that. All I'm addressing here today is Ms. Liscano's sentence. And I would respectfully suggest that Ms. Liscano's sentence should be set aside and that this court should remand for resentencing. And if there are no other questions, I thank the court for its time. All right. Thank you both very, very much. Thank you. We're in recess for the week.